IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

WRK V. WIEGERT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

WRK, LLC, APPELLANT,

V.

ZACH WIEGERT, APPELLEE.

Filed July 1, 2025.    No. A-24-143.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge.
Reversed and remanded for further proceedings.

Daniel J. Epstein, of Goosmann Law Firm, P.L.C., for appellant.

Heather Voegele and Andreanna C. Smith, of Voegele Anson Law, L.L.C., for appellee.

RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

WRK, L.L.C. (WRK), filed a complaint against Zach Wiegert for breach of contract regarding a covenant not to compete. Wiegert then filed a counterclaim against WRK for tortious interference with business and potential business relationships. The Lancaster County District Court entered summary judgment in favor of Wiegert on WRK's breach of contract claim. Wiegert subsequently requested and an order was entered dismissing his counterclaim without prejudice. WRK appealed the summary judgment order.

We first conclude that we have jurisdiction over WRK's appeal despite the voluntary dismissal without prejudice of Wiegert's counterclaim. We also conclude that there are genuine issues of material fact which prevent summary judgment as a matter of law. We therefore reverse the order granting summary judgment in favor of Wiegert on WRK's breach of contract claim, and we remand the cause to the district court for further proceedings.

- 1 -

## II. BACKGROUND

### 1. PARTIES, AGREEMENTS, AND COVENANT NOT TO COMPETE

WRK is a real estate development and investment firm, and Wiegert is a commercial and residential real estate developer. For a period of time, WRK, Wiegert, and another privately held real estate development company out of Salt Lake City, Utah, named Woodbury Corporation (Woodbury), worked on projects together, including a project in Lincoln, Nebraska, referred to as "Project Oscar" or "Project Oscar 1." According to Woodbury's senior vice president/general counsel, when "it became apparent that the parties could no longer work together," they "basically divided up assets, debts and territory." The parties negotiated a document "to basically divorce."

As relevant to the present litigation, the negotiated documents included a covenant not to compete provision contained in a "Settlement Agreement" and a "West Haymarket Agreement," to which WRK and Wiegert were parties. Specifically, the West Haymarket Agreement, effective as of August 24, 2012, prohibited Wiegert, and other individuals and entities, from competing in the "West Haymarket Redevelopment Project Area," except for "NE Block 3," "as a developer of a new building construction, or as an owner, landlord, or tenant of real estate" for a period of 7½ years.

In 2018, before the 7½-year period had expired, WRK learned that Wiegert was involved in a development referred to as "Project Oscar 2.0" or "Project Oscar 2." This development was within the West Haymarket Redevelopment Project Area outside of "NE Block 3."

The West Haymarket Agreement included a provision for "**Default and Remedies**" (emphasis in original) in the event there was a failure to comply with the covenant not to compete. That provision is found in section 13(a) and provides:

i. If WRK has reasonable cause to believe that the defaulting party(ies) is failing to comply with the covenant not to compete provision . . . WRK has the right to deliver to the defaulting party(ies) a written notice demanding that the defaulting party(ies) immediately cease any and all competing activities or else be subject to liquidated damages as described herein . . . ("**Special Notice**").

ii. If the defaulting party(ies) immediately cures and complies with the covenant not to compete provision within three (3) days after receiving the Special Notice, then WRK would still have the option to seek any remedy at law or in equity without notice or demand against the defaulting [sic] for the alleged failure to comply with the covenant not to compete that occurred on or before three (3) days after delivery of the Special Notice.

iii. If the defaulting party(ies) fails to cure and comply with the covenant not to compete provision within three (3) days after delivery of the Special Notice, then WRK shall have the sole remedy of liquated [sic] damages described herein against the defaulting party(ies). For a proven default of the covenant not to compete provision after receipt of the Special Notice, the defaulting party(ies) is liable (or jointly liable if two or more defaulting parties) to pay WRK the sum of Three Million Five Hundred Thousand and No/100 Dollars ($3,500,000.00) as full liquidated damages for such default of the covenant not to compete provision. The parties hereto acknowledge and agree that it is impossible at the present time to more precisely estimate the damages to be suffered by WRK upon the defaulting party's(ies') default and such sum is a reasonable estimate of the damages

that would be incurred by WRK for a default of the covenant not to compete by the defaulting party(ies). The liquidated damages provision is intended not as a penalty, but as full liquidated damages.

(Emphasis in original.)

### 2. COMPLAINT, COUNTERCLAIM, AND MOTIONS FOR SUMMARY JUDGMENT

In June 2019, WRK filed a complaint against Wiegert for breach of contract. WRK alleged as follows. The covenant not to compete contained in the West Haymarket Agreement would terminate 7½ years after the date of the West Haymarket Agreement, which was approximately February 24, 2020. A new building was being constructed in the West Haymarket area outside of the NE Quarter of Block 3, on land "owned by Project Oscar 2.0, LLC, (hereinafter "Project Oscar 2.0")." As of May 2018, Wiegert, individually and on behalf of his related entities, held himself out as a developer of Project Oscar 2.0. On September 6, 2018, WRK, pursuant to the West Haymarket Agreement, provided a Special Notice to Wiegert that WRK had reasonable cause to believe that he or an affiliated entity were failing to comply with the covenant not to compete, and WRK demanded Wiegert immediately cease any and all competing activities in accordance with the terms of the West Haymarket Agreement. Wiegert and/or one of his related entities failed to cure and comply with the covenant not to compete within 3 days after delivery of the Special Notice. Pursuant to the West Haymarket Agreement, WRK had the sole remedy of liquidated damages in the event a party failed to cure and comply with the covenant not to compete provision within 3 days after delivery of the Special Notice. Wiegert did not cure and comply with the Special Notice within 3 days after delivery of the Special Notice and WRK sought $3.5 million as "full liquidated damages" for Wiegert's alleged breach of the covenant not to compete. In addition to praying for a judgment against Wiegert in the amount of $3.5 million, pre-judgment and post-judgment interest, attorney fees, and costs, WRK also prayed for "any other relief this Court deems just and equitable, including any other damages allowed under the Settlement Agreement and/or the West Haymarket Agreement."

In September 2020, Wiegert filed an amended answer and counterclaim. In his answer, Wiegert denied WRK's allegations of breach of contract. In his counterclaim against WRK, Wiegert alleged tortious interference with business relationships and prospective business relationships and damage by the same, "as Wiegert will now have to disclose on certain real estate development applications that he was sued and was a party to [WRK's complaint], regardless of the outcome of the [l]awsuit." Wiegert sought a judgment in his favor "in an amount to be determined at trial." He also sought pre-judgment and post-judgment interest and attorney fees.

The parties filed competing motions for summary judgment on WRK's complaint. A hearing on the motions for summary judgment was held on April 20, 2023.

### 3. EVIDENCE AT SUMMARY JUDGMENT HEARING

The Settlement Agreement and the West Haymarket Agreement were received into evidence at the summary judgment hearing. As stated previously, the West Haymarket Agreement, effective as of August 24, 2012, prohibited Wiegert, and other individuals and entities, from competing in the "West Haymarket Redevelopment Project Area," except for "NE Block 3," "as

a developer of a new building construction, or as an owner, landlord, or tenant of real estate" for a period of 7½ years.

Among the other exhibits received into evidence were the depositions of DaNay Kalkowski and Jeffrey Jenkins. Their depositions included evidence about events alleged to have occurred prior to the September 2018 Special Notice.

(a) Kalkowski Deposition

Kalkowski's deposition was taken on July 20, 2021. In her deposition, Kalkowski testified that she was an attorney, and she specialized in "real estate, land, use, work" and did a lot of work for developers. Kalkowski's partner drafted the Settlement Agreement and West Haymarket Agreement to which WRK and Wiegert were parties.

Kalkowski's firm was involved in the legal work for the development of Project Oscar, the building on the corner of Canopy and P Street. Her firm worked on Project Oscar, LLC, documents in 2012. She believed an entity that Wiegert was involved in was a member of Project Oscar.

Kalkowski was the attorney for Project Oscar 2, and said she would refer to the land and the building as Project Oscar 2 (earlier in her deposition testimony she said she would refer to the land and the building as Project Oscar 2.0). "I believe I am still the attorney for Project Oscar 2." When asked by WRK if Project Oscar 2, LLC, was still in existence, Kalkowski's counsel objected on the basis of attorney-client privilege. When asked when she became the attorney for Project Oscar 2, LLC, Kalkowski replied, May 31, 2018. When asked why she said May 31, 2018, Kalkowski replied, "[B]ecause on that date, I received a phone call from Zach Wiegert and a separate phone call from Jeff Jenkins about representing Project Oscar 2 -- the project called Project Oscar 2." She confirmed that after May 31 she prepared the corporate formation documents. (Jenkins is the chief financial officer at Olsson, and his deposition will be discussed later.)

Kalkowski stated, "We set up initially, you know, weekly or biweekly meetings with the city when the project started." Between May 31 and August of 2018, Wiegert was present "at about three" of the meetings with the city that Kalkowski attended. The purpose of those meetings was "to discuss the Project Oscar 2 Redevelopment project." WRK's counsel asked if, at any of those meetings with the city, Wiegert indicated that he was representing Project Oscar 2.0 in any capacity. Kalkowski responded, "I think my impression was that he would have indicated he was working on Project Oscar 2 with Olsson."

There were several deposition exhibits containing emails. On May 31, 2018, Wiegert (Managing Principal, Goldenrod Companies) sent an email to Kalkowski ("Cc" to Jenkins) with the "Subject: Oscar 2.0" wherein Wiegert wrote, "As we talked about earlier, here is a copy of the site layout, building floorplans/renderings, and project budget. Please let me know that you have the redevelopment agreement we did for the first phase building"; the email included "Attachments: Project Oscar II_Plans & Concept Images_2018-05-16.pdf; Oscar 2.0 Budget(05.31.2018).pdf." On June 4, Kalkowski sent an email to Wiegert with the "Subject: WRK" wherein Kalkowski stated in relevant part, "[Y]ou have a covenant not to compete with WRK as a developer on the SE corner of Block 3 that needs to be addressed for the building project to move forward." On June 25, Wiegert replied,

- 4 -

Just so you know, I talked with Walker and we are going to make part of our consideration for extending the timeline in which WRK can pay us the amount owed would be the release of my non-compete on the south block site where the Oscar 2.0 building would go.

On July 14, Kalkowski sent an email to Wiegert and Jenkins with the "Subject: Project Oscar II" wherein Kalkowski wrote:

As both of you are aware, [Wiegert] is subject to a "covenant not to compete" provision in previous agreements with WRK that restricts him from acting as a developer on the property which is being proposed for the new Project Oscar II building. While [Wiegert] has been working to get the noncompete released for the new project, that has not yet occurred. However, negotiations continue to move forward with the City. Unfortunately, [Wiegert's] active involvement in Project Oscar II's negotiations with the city on the new project are in conflict with the covenant not to complete [sic]. Since our office represented all parties in the Settlement Agreement that contains the covenant not to compete, Kent [Seacrest] and I feel we cannot continue to represent Project Oscar II in negotiations with the City on the new project in knowing violation of the noncompete until the noncompete issue has been resolved.

That same day, Wiegert replied, "If I remove myself from actively negotiating, does that resolve the conflict. In this case you would just be representing Olsson." On July 16, Kalkowski replied:

[Wiegert],

The covenant not to compete against WRK in the West Haymarket Redevelopment Area includes competition not only as a developer of new building construction, but also as an owner, landlord or tenant. You would have to totally remove yourself from both the development and ownership end until such time as the noncompete is released or expires (7 ½ years after August 24, 2012).

WRK's counsel proceeded to ask Kalkowski about the deposition exhibit emails. Kalkowski's counsel and Wiegert's counsel made several objections based on attorney-client privilege; Wiegert's counsel stated that while the emails "speak[] for [themselves]," the context around them "could possibly contain attorney-client privilege."

### (b) Jenkins Deposition

In his deposition taken on October 24, 2022, Jenkins testified that for the first Olsson building, Wiegert "connected" Olsson to Woodbury (an original owner of the building) and Tetrad in 2012 or 2013, "whenever the building was being planned out"; Tetrad was the property manager and "wore the hat of development manager." Jenkins said that Wiegert was involved in the development activities to construct the building, planned the site (i.e., "[p]roject management"), and oversaw leasing. Project Oscar, LLC, owned 100 percent of the first Olsson building at the time of Jenkins' deposition; a wholly owned subsidary of Olsson owned 50 percent of Project Oscar, LLC, and "Goldenrod" or Tetrad (Jenkins could not remember which one) owned the other 50 percent. Jenkins stated, "we moved into the first building around 2015 or '16, somewhere in

there. Started filling -- filling it up rapidly. Leasing went well. We actually leased space . . . in a building across the street because we were in overflow mode already" and then "it made sense to start to plan a second building."

Jenkins testified that "Project Oscar II" started constructing the Olsson building in 2018, and the building was finished "[m]aybe 2019 sometime, 2020." To Jenkins, Project Oscar II is the same as Project Oscar 2.0, LLC. WRK's counsel asked Jenkins, "[A]re you aware that some people on the path have called this 'Project Oscar II,' the building we're currently in?" Jenkins replied, "Sure." Jenkins said that Tetrad did some of the "conceptual planning" for this building "as it relates to the first building, and coordination between the two." Wiegert "was involved as an owner with Tetrad in the first building, and the involvement was to essentially expand the -- the building footprint into what became Project Oscar 2.0." Wiegert attended "[t]wo or three" meetings with the city at which Jenkins was present. At those meetings, "[Wiegert] was playing the same role that he played in the first building"; in the first building Wiegert's role was "[n]egotiating the redevelopment agreement with the city, governing the construction of the building," "[d]evelopment, management, and oversight."

Jenkins first learned that Wiegert had a covenant not to compete from Kalkowski. Jenkins reported the noncompete to the Olsson board, Brad Strittmatter (CEO of Olsson), Mark Palmer (civil engineer for Olsson, project management), "people involved in the project." When asked if he knew when Olsson officially cut ties with Wiegert or the Tetrad entities, Jenkins replied, "No."

The exhibits attached to Jenkins' deposition contained emails. On June 6, 2018, Jenkins sent an email to Wiegert (at his Goldenrod Companies email address) that stated in part, "[I]n talking with [Kalkowski] . . . it sounds like the WRK issue is still in play (whatever it is!). We need to understand what is going on with this to insure [sic] Olsson or the project does not get caught in the middle." On June 7, Wiegert sent an email to Jenkins (with a "Cc" to Strittmatter at Olsson) which states:

> I had a conversation with [Kalkowski] in which she explained to me that I have a "non-compete" in the West Haymarket that still does not run out for a couple more years. There are no "economical" concerns remaining on that block to speak of. As they owe us $750,000 on the Huddle [sic] block and are in the process of negotiating an extension for their inability to pay, [Kalkowski] and I both believed it is a great time to approach them to release the "non-compete" or I will put a lien on their building as it is directly tied to our payment. Don't believe this should be to [sic] big of deal to take care of. I may also call the mayor and let him know that I may want him to call and encourage them to act in good faith of [sic] the project and what is best for the city of Lincoln.
>
> I have a call in to legal council [sic] that is working on the current settlement to make sure this release is a part of the deal.

On July 16, Kalkowski sent an email to Wiegert (and a "Cc" to Jenkins) with the "Subject" "Project Oscar II," stating,

> The covenant not to compete against WRK in the West Haymarket Redevelopment Area includes competition not only as a developer of new building construction, but also as an owner, landlord or tenant. You would have to totally remove yourself from both the

development and ownership end until such time as the noncompete is released or expires (7 ½ years after August 24, 2012).

(During his deposition, Jenkins was asked, "And sometime as of July 16, 2018, Mr. Wiegert or one of his entities was, in your mind, involved in development of the building we're currently sitting in?" Jenkins replied, "Yes.")

The deposition exhibits also contain emails exchanged from August 14 and 16, 2018, between Wiegert (Managing Principal, Goldenrod Companies) and Dan Grasso with the "Subject" "For Olsson" wherein Wiegert and Grasso discussed tenant diagrams with "[r]entable numbers" and company labels, and "dress[ing]" up company logos/colors; one of the emails noted "Attachments: Oscar 2.0_Tenant Diagrams_2018-08-16_With Commonwealth.pdf; Oscar 2.0_Tenant Diagrams_2018-08-16.pdf." Jenkins was included as a recipient of those emails between Wiegert and Grasso. (In his deposition, Jenkins stated that Grasso was the architect on the project.)

### (c) Special Notice

On September 6, 2018, a "Special Notice-Violation of Covenant Not to Compete" was sent to Wiegert and stated, in relevant part:

> This letter is intended to provide you with notice that WRK has reasonable cause to believe that you, or an entity affiliated with you . . . are failing to comply with the covenant not to compete contained in Paragraph 6 of the [West Haymarket] Agreement. Accordingly, WRK demands that you immediately cease any and all competing activities in accordance with the terms of the Agreement.

Deposition testimony regarding Wiegert's alleged actions following the Special Notice will be discussed later in our analysis.

### 4. DISTRICT COURT'S ORDER ON SUMMARY JUDGMENT

In its order entered on September 8, 2023, the district court found that in "[r]eviewing the evidence in the light most favorable to WRK," Wiegert met his prima facie burden for his motion for summary judgment and WRK failed to show the existence of a material issue of fact which would prevent judgment for Wiegert as a matter of law. The court stated that WRK's only cause of action falls under the liquidated damages provision of the West Haymarket Agreement. It opined that a fact finder would have to speculate to conclude that Wiegert breached the covenant not to compete 3 days after receiving the Special Notice, and therefore, WRK failed to show the existence of a material issue of fact which would prevent judgment for Wiegert as a matter of law. The court found that WRK's failure to prove an essential element of its liquidated damages claim -- i.e., that Wiegert failed to cure and comply with the covenant not to compete 3 days after the Special Notice -- necessarily rendered all other facts immaterial and entitled Wiegert to summary judgment as a matter of law. The court therefore sustained Wiegert's motion for summary judgment and overruled WRK's motion for summary judgment.

## 5. Subsequent Dismissal of Wiegert's Counterclaim and WRK's Appeal of Summary Judgment Order

On November 9, 2023, WRK filed a motion for summary judgment on Wiegert's counterclaim. WRK alleged that "as of the date of this filing, [Wiegert] has failed to produce or identify any damages related to his Counterclaim."

On January 26, 2024, Wiegert filed a motion to dismiss his counterclaim without prejudice. That same day, the district court ordered the dismissal of Wiegert's counterclaim without prejudice.

WRK appeals the district court's September 8, 2023, order sustaining Wiegert's motion for summary judgment and overruling WRK's motion for summary judgment.

## III. ASSIGNMENTS OF ERROR

WRK assigns, reordered and restated, that the district court erred: (1) in determining that there was no issue of material fact and granting summary judgment in favor of Wiegert given the deposition testimony of certain witnesses "in which Wiegert admitted to working on the disputed project after receiving the Special Notice"; (2) by incorrectly applying the Special Notice provision and ignoring other provisions in the parties' agreement; (3) in granting summary judgment in favor of Wiegert rather than in favor of WRK given the "judicial admissions" or "admissions against interest" about Wiegert's membership in the disputed project that his counsel made during a witness' deposition; and (4) in overruling the objections and admitting into evidence Wiegert's affidavit.

## IV. STANDARD OF REVIEW

A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law. *Clason v. LOL Investments*, 316 Neb. 91, 3 N.W.3d 94 (2024).

An appellate court independently reviews questions of law decided by a lower court. *Id.*

An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Woodward v. Saint Francis Med. Ctr.*, 316 Neb. 737, 6 N.W.3d 794 (2024). An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Id.*

## V. ANALYSIS

### 1. Jurisdiction

Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *Clason v. LOL Investments, supra.* Pursuant to Neb. Rev. Stat. § 25-1911 (Reissue 2016), for an appellate court to acquire jurisdiction of an appeal, the party must be appealing from a final order or a judgment. *Clason v. LOL Investments, supra.* Additionally, where implicated, an order must comply with Neb. Rev. Stat. § 25-1315 (Reissue 2016) and adjudicate all claims of all parties, unless the trial court makes an express determination that there is no just reason for delay of an appeal of an order disposing of

less that all claims or all parties. *Clason v. LOL Investments, supra*. An appellate court lacks jurisdiction to entertain an appeal unless it is from a final order or a judgment. *Id.*

After the appeal in this case was filed, this court entered an order directing the parties as follows:

> This matter has come before this court in the course of a jurisdiction review. The district court's order of January 26, 2024, dismissed without prejudice the remaining claims in the case. Generally, appellate jurisdiction cannot be created by a voluntary dismissal without prejudice of unresolved claims, as such procedure does not create finality. See, *Clason v. LOL Investments*, 316 Neb. 91, 3 N.W.3d 94 (2024); *Last Pass Aviation v. Western Co*[-]*op. Co.,* 296 Neb. 165, 892 N.W.2d 108 (2017); *Addy v. Lopez*, 295 Neb. 635, 890 N.W.2d 490 (2017); *Smith v. Lincoln Meadows Homeowners Assn.*[], 267 Neb. 849, 678 N.W.2d 726 (2004). The parties are directed to address in their briefs whether this court has jurisdiction over this appeal.

Following our direction, WRK addressed this court's jurisdiction over the appeal in its brief; Wiegert provided one sentence stating that it agreed with WRK. WRK argues:

> [T]his appeal is not similar to the above cited case law. In the cited case law, it was clear the parties worked in conjunction to have one party dismiss their claims, without prejudice, so that an appeal could be made with the understanding that after an appellate ruling was obtained, the dismissed claims would be reinstated, and the underlying lawsuit would continue forward. In our appeal, there has been no collusion between the parties to manufacture a final order.

Brief for appellant at 6.

We do not find persuasive WRK's attempt to distinguish *Clason v. LOL Investments, supra*. In *Clason*, the plaintiff defaulted on an agricultural loan secured by a deed of trust on farm property, and the property was sold at a trustee's sale. When the plaintiff refused to surrender the property to the purchaser, litigation ensued. The plaintiff filed a quiet title action naming the deed holder and the purchaser as defendants. The plaintiff alleged that the trustee's sale was invalid, and that the purported sale was void. The plaintiff sought an order quieting title to the farm property in his name. The defendant purchaser filed a counterclaim to quiet title in its name and also brought claims for ejectment and unjust enrichment; that defendant also alleged that it was entitled to attorney fees because the plaintiff's quiet title action was frivolous and filed in bad faith. The defendant purchaser moved for partial summary judgment on the plaintiff's claim to quiet title and on its counterclaim to quiet title. The defendant deed holder moved to dismiss the plaintiff's complaint with prejudice for failure to state a claim and also requested attorney fees. The district court entered an order holding that the defendant purchaser was entitled to summary judgment as a matter of law; it dismissed the plaintiff's quiet title complaint with prejudice and ordered that title to the farm property be quieted in the defendant purchaser. The court also dismissed the plaintiff's complaint against the defendant deed holder for failure to state a claim upon which relief could be granted. The order did not address the remaining claims made by the defendant purchaser in its counterclaim or the pending requests for attorney fees. The plaintiff's first appeal was dismissed for lack of jurisdiction because the order from which the plaintiff appealed had not

resolved all the claims; the counterclaims for ejectment and unjust enrichment remained pending, and the district court had not yet ruled on the request for attorney fees. See *id.*

During the pendency of the first appeal, the parties continued to litigate in the district court. The defendant purchaser sought and was granted leave to file an amended counterclaim retaining the claims for ejectment and unjust enrichment and adding a claim for forcible entry and detainer; the amended counterclaim also requested attorney fees. The defendant purchaser then moved for partial summary judgment on its forcible entry and detainer counterclaim, and the district court granted the motion. The plaintiff appealed, but the appeal was again dismissed for lack of jurisdiction because not all causes of action had been disposed of and the request for attorney fees was still pending. See *id.*

After the second appeal was dismissed, the defendant purchaser filed a motion asking the district court to dismiss, without prejudice, all of its unresolved claims under its counterclaim and its pending request for attorney fees; the court sustained the motion. The defendant deed holder also moved for an order dismissing, without prejudice, its pending motion for attorney fees; the court sustained the motion. The plaintiff then filed a notice of appeal.

The Nebraska Supreme Court once again determined that there was no appellate jurisdiction because the appeal was not from a final judgment or final order. It stated:

> The trial court did not purport to enter a final judgment in this case, and the appellate record contains no § 25-1315 certification of any order. But at oral argument before this court, the parties generally took the position that once the unresolved counterclaims and pending attorney fee requests were voluntarily dismissed without prejudice, [the plaintiff] could appeal from the previously entered summary judgment orders. We disagree.

*Clason v. LOL Investments*, 316 Neb. at 97, 3 N.W.3d at 98-99.

The Nebraska Supreme Court specifically recounted its prior opinions in *Last Pass Aviation v. Western Co-op. Co.*, 296 Neb. 165, 892 N.W.2d 108 (2017), and *Smith v. Lincoln Meadows Homeowners Assn.*, 267 Neb. 849, 678 N.W.2d 726 (2004). It also cited to its opinion in *Addy v. Lopez,* 295 Neb. 635, 890 N.W.2d 490 (2017). It then said:

> In our prior cases applying the rule that appellate jurisdiction cannot be created by voluntary dismissals without prejudice of unresolved claims, the dismissing parties expressly informed the trial court that they intended to pursue the dismissed claims after completing the appeal. Here, the parties' motions did not recite their intent to pursue the issues after completion of the appeal, but at oral argument before this court both [the defendant purchaser and the defendant deed holder] candidly acknowledged they dismissed their unresolved claims "without prejudice" because they intended to bring them back before the [district] court after the conclusion of this appeal. . . .
>
> In *Last Pass Aviation* and *Smith*, we held that finality for purposes of appeal cannot be created by dismissing unresolved claims without prejudice, and the same rule applies here. When the matter was remanded to the district court after the second appeal, there were counterclaims and requests for attorney fees that remained unresolved. The trial court set a pretrial conference so those claims could be adjudicated. But instead of litigating the unresolved claims or dismissing them with prejudice, [the defendant purchaser and the defendant deed holder] voluntarily dismissed them without prejudice, intending to bring

- 10 -

them back before the district court after [the plaintiff] appealed from the summary judgment rulings. This procedure did not end the litigation between the parties or create the finality necessary to confer appellate jurisdiction.

*Clason v. LOL Investments*, 316 Neb. 91, 99-100, 3 N.W.3d 94, 100 (2024). The Supreme Court stated that it lacked jurisdiction because the plaintiff had not appealed from a final judgment or a final order, and the appeal was dismissed.

In the instant case, the district court's September 8, 2023, order resolved WRK's claim for breach of contract by granting summary judgment in favor of Wiegert. However, the September 8 order did not resolve Wiegert's counterclaim for tortious interference with business relationships and prospective business relationships. On November 9, WRK filed a motion for summary judgment on Wiegert's counterclaim. Instead of litigating those unresolved claims, on January 26, 2024, Wiegert filed a motion to dismiss his counterclaim without prejudice. That same day, the district court ordered the dismissal of Wiegert's counterclaim without prejudice. WRK subsequently appealed the summary judgment order of September 8, 2023.

WRK contends that this case is distinguishable from *Clason v. LOL Investments, supra*, *Last Pass Aviation v. Western Co-op. Co., supra*, *Addy v. Lopez, supra*, and *Smith v. Lincoln Meadows Homeowners Assn., supra*, because in those cases "it was clear the parties worked in conjunction to have one party dismiss their claims, without prejudice so that an appeal could be made with the understanding that after an appellate ruling was obtained, the dismissed claims would be reinstated, and the underlying lawsuit would continue forward." Brief for appellant at 6. However, "In our appeal, there has been no collusion between the parties to manufacture a final order." *Id.*

WRK argues:

The interests of justice and judicial efficiency would support the conclusion that the January 26, 2024, Order is a final order. Since there is no plan or collusion to circumvent the final order requirements, in future lawsuits parties would be left to guess if a dismissal by an opposing party was sufficient for appeal purposes while the appeals clock ticked down. . . .

While the cited Nebraska case law does establish that appellate jurisdiction cannot be created by voluntarily dismissing without prejudice unresolved claims while still reserving the right to later relitigate the dismissed unresolved claims, to extend this doctrine to a situation where there is no plan between the parties would unfairly give one party the sole authority to determine when, and if, a final order exists.

*Id.* at 8-9. WRK further argues, "Since there is no language or evidence to support a determination that Wiegert plans to relitigate his counterclaim after this appeal is concluded, the above cited opinions are not controlling, the January 26, 2024[,] Order is a final order, and this Court has jurisdiction for this appeal." *Id.* at 10.

While it may be true that at this point there has been no "language or evidence to support a determination that Wiegert plans to relitigate his counterclaim after this appeal is concluded," brief for appellant at 10, that was also true in *Clason v. LOL Investments, supra*, up until oral arguments in the third appeal. A voluntary dismissal "without prejudice" presumes that the party

wants to refile their claim at a later date, or to at least preserve the possibility of refiling their claim. We are not persuaded that we should read *Clason v. LOL Investments, supra*, to mean that as long as there is silence regarding any intent to relitigate a counterclaim after appeal, that the silence on the record creates the finality necessary to confer appellate jurisdiction. In *Clason*, the record did not reveal any intent to pursue the dismissed claims after completion of the appeal, but at oral argument, both defendants acknowledged an intent to pursue the claims following the conclusion of the appeal. WRK asks this court to distinguish the present case from *Clason*, because it claims that "the parties will not be acknowledging a plan to bring back unresolved claims after the conclusion of the appeal since no plan exists." Brief for appellant at 7. However, we do not read *Clason* to create the loophole that would exist under WRK's view; in other words, we do not read *Clason* to require waiting until oral argument to confirm the parties' intentions regarding voluntarily dismissed claims in order to determine jurisdiction over the appeal at that time. Accordingly, we find that Wiegert's voluntary dismissal of his counterclaim without prejudice while WRK's motion for summary judgment as to his counterclaim was pending, did not, in and of itself, create the finality necessary to confer appellate jurisdiction.

As to WRK's point that such a ruling would "unfairly give one party the sole authority to determine when, and if, a final order exists," brief for appellant at 9, that is an argument better made to the district court in seeking a § 25-1315 certification.

Section 25-1315(1) provides:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

The Nebraska Supreme Court has held that where § 25-1315 is implicated, one may bring an appeal pursuant to such section only when (1) multiple causes of action or multiple parties are present, (2) the court enters a "final order" within the meaning of Neb. Rev. Stat. § 25-1902 (Reissue 2016) as to one or more but fewer than all of the causes of action or parties, and (3) the trial court expressly directs the entry of such final order and expressly determines that there is no just reason for delay of an immediate appeal. *Dylan H. v. Brooke C.*, 317 Neb. 264, 271, 9 N.W.3d 439, 445 (2024). The trial court's express determination is sometimes referred to as "certification." *Id*. The record before this court does not contain a certification under § 25-1315(1).

However, this appeal presents an additional issue not addressed in the above-cited cases. Despite the voluntary dismissal of the counterclaim "without prejudice" in and of itself not creating the finality necessary to confer appellate jurisdiction, and the lack of a certification under § 25-1315(1), we have also considered whether the statute of limitations would bar Wiegert from refiling his counterclaim in the future.

Wiegert's counterclaim asserted tortious interference with business or potential business relationships and would be subject to a 4-year statute of limitations under either Neb. Rev. Stat. § 25-207 or § 25-212 (Reissue 2016). His causes of action were premised on the filing of the complaint by WRK, and his allegation that he "will now have to disclose on certain real estate development applications that he was sued and was a party to [WRK's complaint], regardless of the outcome of the [l]awsuit." Thus, the triggering event for statute of limitations purposes was the filing of the complaint by WRK on June 20, 2019. See *Alston v. Hormel Foods Corp.*, 273 Neb. 422, 730 N.W.2d 376 (2007) (it has generally been stated that statute of limitations begins to run as soon as claim accrues, and action in tort accrues as soon as act or omission occurs). Based on the facts alleged, the statute of limitations for Wiegert's claim would have run on June 20, 2023. The district court's summary judgment ruling on WRK's complaint was not entered until September 8. Wiegert's counterclaim was subsequently dismissed "without prejudice" on January 26, 2024.

If Wiegert wanted to refile his claim for tortious interference with business or potential business relationships, he would face a statute of limitations issue. The general rule is that where a complaint does not disclose on its face that it is barred by the statute of limitations, a defendant must plead the statute as an affirmative defense, and, in that event, the defendant has the burden to prove that defense. If, however, the complaint on its face shows that the cause of action is time barred, the plaintiff must allege facts to avoid the bar of the statute of limitations and, at trial, has the burden to prove those facts. *Lindner v. Kindig*, 285 Neb. 386, 826 N.W.2d 868 (2013). If Wiegert sought to refile his claim, which (under the facts alleged in his original counterclaim) would show on its face that the cause of action is time barred, he would have to allege facts to avoid the bar of the statute of limitations; if he did not, then the district court could dismiss his claim.

At oral arguments before this court, Wiegert's counsel acknowledged that he had no intention to refile his claim for tortious interference with business or potential business relationships, and counsel said, "[Q]uite frankly . . . we would be barred by the statute of limitations." Given Wiegert's acknowledgement regarding the statute of limitations bar, we find that the district court's order of January 26, 2024, created the finality necessary to confer appellate jurisdiction.

## 2. SUMMARY JUDGMENT

### (a) General Legal Principles

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Clark v. Scheels All Sports*, 314 Neb. 49, 989 N.W.2d 39 (2023). The Nebraska Supreme Court has long held that the party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. *Id.* If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id.* But in the absence of a

prima facie showing by the movant that he or she is entitled to summary judgment, the opposing party is not required to reveal evidence which he or she expects to produce at trial. *Id.*

In the summary judgment context, a disputed fact is material only if it would affect the outcome of the case. *Id.* Conclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for the purposes of summary judgment; the evidence must be sufficient to support an inference in the nonmovant's favor without the fact finder engaging in guesswork. *Id.*

An appellate court may affirm summary judgment on any ground available to the trial court, even if it is not the same reasoning the trial court relied upon. *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024).

WRK argues that there are genuine issues of material fact that should have precluded summary judgment in favor of Wiegert.

### (b) Compliance With Covenant Not to Compete
### After Special Notice

As stated previously, the West Haymarket Agreement, effective as of August 24, 2012, prohibited Wiegert, and other individuals and entities, from competing in the "West Haymarket Redevelopment Project Area," except for "NE Block 3," "as a developer of a new building construction, or as an owner, landlord, or tenant of real estate" for a period of 7½ years.

The "Special Notice-Violation of Covenant Not to Compete" sent to Wiegert on September 6, 2018, stated, in relevant part:

> This letter is intended to provide you with notice that WRK has reasonable cause to believe that you, or an entity affiliated with you . . . are failing to comply with the covenant not to compete contained in Paragraph 6 of the [West Haymarket] Agreement. Accordingly, WRK demands that you immediately cease any and all competing activities in accordance with the terms of the Agreement.

"Reviewing the evidence in the light most favorable to WRK," the district court found that Wiegert met his prima facie burden for his motion for summary judgment and that WRK failed to show the existence of a material issue of fact which would prevent judgment for Wiegert as a matter of law. More specifically, the court opined that a fact finder would have to speculate to conclude that Wiegert breached the covenant not to compete 3 days after receiving the Special Notice in September 2018. See *Clark v. Scheels All Sports, supra* (conclusions based on guess, speculation, conjecture, or choice of possibilities do not create material issues of fact for purposes of summary judgment; evidence must be sufficient to support inference in nonmovant's favor without fact finder engaging in guesswork.) The court found that WRK failed to show the existence of a material issue of fact which would prevent judgment for Wiegert as a matter of law.

WRK contends that the district court erred in determining that there was no issue of material fact and granting summary judgment in favor of Wiegert given the deposition testimony of Joshua Berger and Jude Beller to whom Wiegert admitted to working on the disputed project after receiving the Special Notice.

*(i) Berger Deposition*

Berger's deposition was taken on December 16, 2022. In his deposition, Berger testified that he had been employed by Woodbury Corporation "[g]oing on three years now," and was the director of development for the "midwest office" in Omaha, Nebraska. He previously worked in a similar position for MAG Partners for 3 years, and prior to that Tetrad Property Group (formerly known as Scott, Woodbury, Wiegert) for 8 years.

Berger testified that at Tetrad Property Group, he reported directly to Wiegert. Berger said that "Olsson Associates had approached us . . . Scott, Woodbury, Wiegert, to develop a corporate headquarters for them in the West Haymarket," and to keep the potential move confidential, "we named the project Project Oscar"; "Project Oscar was code for Olsson, Project Olsson" and Berger was the project manager. Due to his employment, Berger was aware of a second agreement between Wiegert and WRK that became known as the West Haymarket Agreement in 2012; Berger was also aware that the West Haymarket Agreement contained a noncompete clause.

When asked by WRK's counsel if the terms "Project Oscar 2.0" meant anything to him, Berger responded, "It's the expansion of the Olsson headquarters to the lot to the south of Project Oscar 1." Berger first learned about Project Oscar 2.0 when he was working at MAG Partners, "[a]nd just in industry conversation, you know brokers and other real estate colleagues, it was sort of out there on the street that Project Oscar 2 was being contemplated and being developed," that "Olsson was growing and so they wanted to expand."

Berger last spoke with Wiegert at a conference called the Association of University Research Park, which was held "in August 2018, I think," at Innovation Campus in Lincoln, Nebraska. Berger and Beller were both working at MAG Partners at the time and were at the conference together; they saw Wiegert at the conference. Berger testified:

[Wiegert] made the comment about working on the second Olsson building.

And he said that he'd gotten a cease and desist letter and looked to [Beller]. We were standing together. And [Wiegert] looked to [Beller] and said, "You know, you're a lawyer, you know you can get out of these things."

And it took me back a little bit but, nevertheless, that's what he said, that he was working on the Olsson building, the second Olsson building. . . .

I do think he mentioned that he had given an offer to Will and Robert to basically buy out a noncompete. And that that was turned down. And that was really the brunt of the conversation.

WRK's counsel asked Berger, "So, this is the second Olsson building[,] [i]s that the same thing as Project Oscar 2 or Project Oscar 2.0 in your mind?" Berger replied, "Yeah, it's the same thing." At the time of Berger's deposition, he said that a "Goldenrod company" was the current owner of the Project Oscar 2 building.

*(ii) Beller Deposition*

Beller's deposition was taken on June 23, 2022. Beller is an attorney. He is also a developer involved in commercial real estate development activities. In his deposition, Beller testified that from 2013 to January 2018 he was employed "in-house" at Tetrad Property Group, working with

Wiegert and his partner; for the first 2½ years, Beller was general counsel, and was then promoted to president. According to Beller, Will and Robert Scott owned WRK.

Beller did see Wiegert "at a convention deal" on Innovation Campus in Lincoln, and they "had a conversation in the hallway." This "would have been around -- somewhere in the year 2019." "I recollect because I quit in 2018, and I didn't think I saw [Wiegert] for about a year. So it would have put it in 2019." During the conversation, Beller asked Wiegert how he was doing and Wiegert "told me about a few of the deals he was working on, and he also indicated he just received a cease-and-desist letter from Will and Robert." Beller "may have asked [Wiegert], or [Wiegert] may have volunteered, talking about how the cease-and-desist was in regards to activity on West Haymarket -- or the Haymarket project with Olsson." Beller "remember[ed] [Wiegert] saying . . . in reference to the . . . cease-and-desist, . . . '[Beller], you're a lawyer, you know we can handle that.'" Beller stated that Berger was also present during the conversation.

Beller knew that Project Oscar was the development project in the Haymarket that housed the Olsson Associates corporate headquarters. He did not know what Project Oscar 2.0 was but, based off what Project Oscar was, "guess[ed]" it was an extension of that office building next door. Beller "never had a single conversation with anybody about Project Oscar 2.0."

*(iii) Genuine Issue of Material Fact?*

Collectively, the depositions of Berger and Beller show that they had a conversation with Wiegert at Innovation Campus wherein Wiegert stated that he was working on the second Olsson building (also known as Project Oscar 2 or Project Oscar 2.0). Wiegert also said he had received a cease-and-desist letter from "Will and Robert," owners of WRK. When talking about the cease-and-desist letter, Wiegert noted that Beller, a lawyer, knew that "you can get out of these things"/"we can handle that." Additionally, Wiegert mentioned that he had offered to buy out a noncompete from Will and Robert, but the offer was turned down. Although Berger recalled that the conversation with Wiegert took place "in August 2018, I think," Beller stated that the conversation occurred in 2019; if the conversation occurred in 2019, that was clearly more than 3 days after the September 2018 Special Notice. Viewing the evidence in the light most favorable to WRK, we find that there was a genuine issue of material fact about whether Wiegert breached the covenant not to compete 3 days after receiving the Special Notice in September 2018. Because there was a genuine issue of material fact, the district court erred in granting summary judgment in favor of Wiegert on WRK's breach of contract claim.

(c) Applicable Provision of West Haymarket Agreement

WRK additionally assigns that the district court erred by limiting its consideration to Wiegert's actions after the Special Notice and ignoring other provisions in the agreement. WRK argues:

> [T]he trial court's determination that WRK was required to prove Wiegert competed after delivery of the Special Notice was in error since it ignored section 13(a)(ii) of the West Haymarket Agreement which establishes WRK's remedy for damages in the event the default[ing] party cures and complies with the covenant not to compete.

Brief for appellant at 54-55.

In response, Wiegert contends that WRK's argument "ignores WRK's own Complaint," which "states one cause of action, breach of contract, and seeks one type of damages, liquidated damages." Brief for appellee at 19. "WRK now states, without any support, that it is entitled to recover for actions taken before the Special Notice." *Id.* at 20.

In its complaint WRK alleged that as of May 2018, Wiegert individually and on behalf of his related entities held himself out as a developer of Project Oscar 2.0. WRK then alleged that it sent a Special Notice to Wiegert on September 6, 2018, and "[u]pon information and belief, within three days after delivery of the Special Notice, Wiegert and/or one of his related entities failed to cure and comply with the covenant not to compete." "Pursuant to the West Haymarket Agreement, WRK has the sole remedy of liquidated damages in the event a party fails to cure and comply with the covenant not to compete provision within three days after delivery of the Special Notice." And "WRK is damaged in the sum of . . . ($3,500,000) as full liquidated damages." In addition to praying for a judgment against Wiegert in the amount of $3.5 million, WRK also prayed for "any other relief this Court deems just and equitable, including any other damages allowed under the Settlement Agreement and/or the West Haymarket Agreement."

In its briefs to the district court, both in support of its motion for summary judgment and in opposition to Wiegert's motion for summary judgment, WRK focused solely on liquidated damages. Subsequently, in its order, the district court found that WRK's only cause of action fell under the liquidated damages provision of the West Haymarket Agreement. It then found that WRK's failure to prove an essential element of its liquidated damages claim -- i.e., that Wiegert failed to cure and comply with the covenant not to compete 3 days after the Special Notice -- necessarily rendered all other facts immaterial and entitled Wiegert to summary judgment as a matter of law.

We have already determined that there was a genuine issue of material fact as to whether Wiegert failed to cure and comply with the covenant not to compete within 3 days after the Special Notice. Therefore, WRK's cause of action under the liquidated damages provision of the West Haymarket Agreement does not fail on that account.

As to WRK's alternative basis for recovery related to section 13(a)(ii) of the West Haymarket Agreement, as noted above, WRK did not raise this argument to the district court at the time of the summary judgment hearing and the court's order made no specific findings as to that section of the agreement. Without specifically finding there had been a breach of the covenant not to compete, the court nevertheless found that there was no proof that Wiegert failed to timely cure and comply with the covenant after the September 2018 Special Notice. It appears that a breach was implicitly assumed by the district court. Since WRK only presented arguments to the trial court related to the recovery of liquidated damages, and since we are reversing as to that issue, we decline to address whether WRK had an alternative basis for recovery since that issue was not raised before the district court. See *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024) (appellate court will not consider issue on appeal that was not passed upon by trial court).

(d) Judicial Admissions or Admissions Against Interest

WRK contends that the district court erred in granting summary judgment in favor of Wiegert rather than in favor of WRK given the "judicial admissions" or "admissions against

"interest" about Wiegert's membership in the disputed project that his counsel made during the deposition of Kalkowski.

During Kalkowski's deposition, WRK's counsel asked Kalkowski about several emails contained in the deposition exhibits. Kalkowski's counsel and Wiegert's counsel made multiple objections based on attorney-client privilege. Wiegert's counsel stated that while the emails "speak[] for [themselves]," the context around them "could possibly contain attorney-client privilege."

The following colloquy was had on the record:

[WRK's counsel]: And, I guess, I have a point of maybe clarification for you, [Wiegert's counsel]. Is . . . Mr. Wiegert taking any position with respect to his involvement with Project Oscar 2?

. . . .

[Wiegert's counsel]: Yes.

[WRK's counsel]: And what's his position?

[Wiegert's counsel]: That he -- I believe that [Wiegert] was advised that he had this non-compete and that he -- when he found that out, he dissociated himself from it and did not participate in the project on any level.

[WRK's counsel]: . . . [I]s the position that at one point in time, Mr. Wiegert was a part of Project Oscar 2.0?

[Wiegert's counsel]: I am not totally clear on all the details. It's very muddied to me, and there are so many parties involved. And I haven't been involved in this case long enough to know. But I don't think I can answer that right now, from what I know.

[WRK's counsel]: Well, if I understand this correctly, we've got a situation where you're objecting as the -- we've heard Mr. -- Ms. Kalkowski -- pardon me -- testified that Project Oscar 2 was her client. Did she say that or not?

[Kalkowski's counsel]: She did.

[WRK's counsel]: Okay. And we've got a situation where you're objecting as to attorney-client privilege, correct?

[Wiegert's counsel]: Yes. So if you -- sorry, maybe I misunderstood your question. If you're saying -- if you're asking if [Wiegert] was at one point involved in Oscar 2.0, our position is that, yes. He was involved at one point in Oscar 2.0. And it's likely a good conversation for you and I to have after the deposition's over, but that is my understanding.

[WRK's counsel]: Okay. So what I marked as deposition Exhibit number 9. And I guess I would refer Mr. Wiegert's counsel to request number 5. It was admitted Defendant Zach Wiegert was a developer of Project Oscar 2.0 in Lincoln, Nebraska and that was denied.

. . . .

[WRK's counsel]: Is the position that -- the opposite now that at one point in time, Mr. Wiegert was a developer of Project Oscar 2.0?

[Wiegert's counsel]: I don't think I can testify right now.

[WRK's counsel]: I'm not asking you to testify. I'm just trying to -- what I mean, this is eventually going to be in front of the Court. And I want to know right now what your position is with respect to his involvement with Project Oscar 2.0. If you're going to be

claiming that there's an attorney-client privilege, I'm trying to figure it out because here it says he denies -- in request number 5, he was a developer. "Was", meaning past tense. And in request number 7, he denies he was an owner of Project Oscar 2.0. And for that matter, denies he was landlord, and denies he was a tenant in 9 and 11. And I'm just trying to figure out now, how is this attorney-client relationship working?

[Wiegert's counsel]: Well, I don't know if this is suitable for Ms. Kalkowski's deposition. It might be a separate conversation that we have later on or a separate motion.

[WRK's counsel]: That's fine, but I want the conversation on the record because I want the Court to know exactly what Mr. Wiegert's position is if you're asserting attorney-client privilege to commu -- to questions that I'm going to be asking Ms. Kalkowski about e-mails.

[Wiegert's counsel]: I'm asserting the client privilege for Mr. Wiegert, as he was a member of an entity that Ms. Kalkowski represented. But as for contents of -- we got requests for admissions I don't -- I don't think that this is suitable for Ms. Kalkowski's deposition.

[WRK's counsel]: Well, what do you mean, it's not suitable?

. . . .

[Wiegert's counsel]: I don't think I can testify. I don't think -- I'm not being deposed.

[WRK's counsel]: I'm not deposing you.

[Wiegert's counsel]: Well, it feels like you're deposing me.

. . . .

[WRK's counsel]: But you're asserting attorney client privilege, correct?

[Wiegert's counsel]: Yes. Yes. I am.

. . . .

[Wiegert's counsel]: Then what's the basis for objecting as to attorney-client privilege?

[Wiegert's counsel]: That he was a member of an entity that she represented.

[WRK's counsel]: What entity?

[Wiegert's counsel]: Of Oscar 2.0. If you want to attack the request for admission, I -- go ahead and file an objection -- file something. You can depose [Wiegert]. I don't know why this is -- why you're cross-examining me on it at Ms. Kalkowski's deposition.

[WRK's counsel]: I'm not. I'm just trying to verify, so when we have our hearing, we're clear as to - - as of today, July 20, 2021, what Mr. Wiegert's position was because it seems to be in contradiction to what his position was on August 9, 2019.

WRK's counsel continued to ask Kalkowski about deposition exhibits, and Kalkowski's counsel and Wiegert's counsel continued to object based on attorney-client privilege; Kalkowski's counsel instructed her not to answer several questions.

In the district court's order from December 2021, it stated that the matter came before the court in October for a hearing on WRK's "Application/Motion for Fees with Respect to [Wiegert's] Failure to Admit." It noted that WRK's basis for arguing Wiegert's denial was

incorrect was an alleged admission by Wiegert's legal counsel at Kalkowski's deposition. The court found:

> Counsel for Wiegert was not testifying at the Deposition, repeatedly requested that WRK's counsel to stop attempting to cross-examine her and did not make any admissions on Wiegert's behalf. Even if Wiegert's counsel did make an admission, her only admission would relate to Project Oscar 2, LLC not Project Oscar 2.0, which is the only term used in Request for Admission No. 7. As a result, WRK did not and cannot point to any admission that would make the Response to Request for Admission No. 7 untrue.
>
> Additionally, the Requests for Admissions identify a difference between Project Oscar, LLC, Project Oscar 2.0 and Oscar II, but none were further defined in the Requests for Admission. Wiegert's prior counsel addressed this issue in a letter to WRK's counsel. Thus, even if an admission had been made, the clear distinction in the names establishes that Wiegert has a good reason for the failure to admit, pursuant to [the Nebraska Discovery Rules].

The court denied WRK's motion/application for fees.

WRK claims that Wiegert's counsel made judicial admissions or admissions against interest that Wiegert was an owner in Project Oscar 2.0. WRK argues that "[p]rior to Wiegert's attorney-client objections in the Kalkowski deposition, Wiegert had steadfastly denied his involvement with the Project," but "[d]espite his previous denials of being involved in the Project, during the deposition of Ms. Kalkowski, Wiegert objected on numerous occasions asserting the attorney-client privilege." Brief for appellant at 42. WRK contends that "Wiegert's 'ownership' served as the basis to assert the attorney-client privilege throughout the Kalkowski deposition" and "[i]f Wiegert was not an owner in the Project, he would have no right to object based on the attorney-client privilege." *Id.* at 45.

In response, Wiegert argues that "[d]espite the repeated attempts at the admissions argument during the litigation, WRK failed to appeal the Court's [December 2021] controlling Order on this issue." Brief for appellee at 18.

The district court's December 2021 order was specifically related to a motion/application for fees regarding Wiegert's alleged untruth in a request for admission. The court found that under those circumstances, Wiegert's counsel did not make an admission on his behalf, and even if there was an admission it did not make Wiegert's response to a particular phrasing in the specified request for admission untrue.

We do not find the district court's December 2021 order to be "controlling," see brief for appellee at 18, for purposes of summary judgment on WRK's breach of contract claim. During Kalkowski's deposition, she was instructed not to answer several questions after Wiegert objected citing attorney-client privilege. However, there is nothing in our record to show that the district court determined whether the attorney-client privilege applied, and whether objections based on such privilege should be sustained or overruled. If the district court were to determine that attorney-client privilege did not apply, and objections based on such privilege were overruled, then the parties could have proceeded with Kalkowski's deposition and elicit her answers to the questions posed.

Because the applicability of attorney-client privilege was not presented to and passed upon by the district court, we cannot determine on appeal whether judicial admissions or admissions against interest exist in this case or have any effect on the summary judgment rulings.

### (e) Wiegert's Affidavit

In his affidavit, Wiegert essentially stated that he had never personally been an owner of Project Oscar 2.0 (or any derivative name thereof), and during the period of August 24, 2012, and February 24, 2020, no entity in which he was or had ever been an owner or manager had a membership interest in Project Oscar 2.0. Wiegert also denied being a developer of Project Oscar 2.0 during that time period.

WRK contends that the district court erred in overruling the objections and admitting into evidence Wiegert's affidavit because it was not disclosed on the evidence index in support of his motion for summary judgment. See, Neb. Ct. R. § 6-1526(A)(1) (rev. 2021) (when motion for summary judgment is filed, moving party must file with clerk and serve on all parties of record Evidence Index in Support listing all evidence to be offered in support of motion for summary judgment). In response, Wiegert contends that his affidavit was included on his evidence index in opposition to WRK's motion for summary judgment. See § 6-1526(B)(1) (each party opposing motion for summary judgment must file with clerk and serve on all parties of record Evidence Index in Opposition listing all evidence to be offered in opposition to motion for summary judgment). Additionally, Wiegert argues that "even if the Affidavit was improperly admitted, the Affidavit does not form the basis of the Court's granting of Wiegert's Motion and therefore, would constitute harmless error." Brief for appellant at 22.

We need not address the admissibility of Wiegert's affidavit at the summary judgment hearing because we have already determined that summary judgment was not proper in this case and that the matter should be remanded back to the district court for further proceedings. See *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024) (appellate court not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

### VI. CONCLUSION

For the foregoing reasons, we find that there were genuine issues of material fact which prevented summary judgment as a matter of law. We therefore reverse the order granting summary judgment in favor of Wiegert on WRK's breach of contract claim, and we remand the cause to the district court for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.